1  LAW OFFICE OF STEPHEN J. NUTTING, LLC
Jose S.P. Mafnas Jr., Esq.
2  P.O. Box 5093 Saipan, MP 96950
3  Phone: (670) 234-6891
Fax: (670) 234-6893
4  Email: jose.sjnlaw@gmail.com

5  Attorneys for Plaintiffs

6

7

**FILED**
Clerk
District Court

NOV 23 2018

for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
8  FOR THE NORTHERN MARIANA ISLANDS

9

CV 18 = 0029

10  TERRY KINGTO                                CIVIL CASE NO.: 18-_____

11           Plaintiff,

12  vs.                                          VERIFIED COMPLAINT FOR VIOLATIONS
                                                 OF AMERICANS WITH DISABILITIES ACT,
13  PTI PACIFICA INC. DBA IT&E ("IT&E"), a       THE AGE DISCRIMINATION IN
CNMI and Guam Corporation and IT&E's current    EMPLOYMENT ACT, AND WRONGFUL
14  employees in their official capacities, to wit: TERMINATION
15  SHIRLEY DOTTS, THERESA TAIMANGLO,
HANS MICKELSON, CRIS BALUYUT, and
16  JULIAN COOPERNURSE.

17           Defendants.

18

19

20       COMES NOW, Terry Kingto, herein Plaintiff, by and through her undersigned counsel, and in

21  support of this Verified Complaint against the above-named Defendants for violations of the Americans

22  with Disabilities Act and the Age Discrimination in Employment Act, along with other State law claims,

23  to hereby allege the following:

24

25

VERIFIED COMPLAINT FOR VIOLATIONS OF AMERICANS WITH DISABILITIES ACT, THE AGE
DISCRIMINATION IN EMPLOYMENT ACT, AND WRONGFUL TERMINATION
PAGE 1

**JURISDICTION**

1. This Court has jurisdiction over Plaintiff's claim under the Americans with Disabilities Act, 42 USC § 12101, *et seq.* ("ADA") and claim under Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") by the provisions of 28 U.S.C. § 1331 (Federal Question Jurisdiction). As for Plaintiff's state law claim, this Court has jurisdiction by the provisions of 28 U.S.C. § 1367(a) (claims arising from claims so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution).

2. The Equal Employment Opportunity Commission (EEOC) issued a right-to-sue notice letter dated August 27, 2018 regarding EEOC Charge No. 486-2017-00406 to Plaintiff Terry Kingto and received by the undersigned counsel. (A true and correct copy can be found attached as Exhibit "A") This lawsuit has been commenced within 90 days of receipt of the Notice of Right to Sue and is timely.

**PARTIES**

3. Plaintiff Terry Kingto ("KINGTO") is a resident of the Commonwealth of the Northern Mariana Islands ("CNMI").

4. Defendant PTI Pacifica, Inc. dba IT&E ("IT&E") is a corporation lawfully operating in Guam and in the CNMI.

5. Defendant Shirley Dotts, in her official capacity as the Human Resources Director in IT&E's Saipan branch, is a resident of Saipan, CNMI.

VERIFIED COMPLAINT FOR VIOLATIONS OF AMERICANS WITH DISABILITIES ACT, THE AGE DISCRIMINATION IN EMPLOYMENT ACT, AND WRONGFUL TERMINATION
PAGE 2

6. Defendant Theresa Taimanglo, in her official capacity as IT&E's Regional Human Resource Director, is a resident of the territory of Guam.

7. Defendant Hans Mickelson, in his official capacity as the sales manager for IT&E's CNMI branch, is a resident of Saipan, CNMI.

8. Defendant Cris Baluyut, in his official capacity as IT&E's sales manager in Guam, is a resident of the territory of Guam.

9. Defendant Julian Coopernurse, in his official capacity as IT&E's Executive Director for Sales in the CNMI and Guam, is a resident of the territory of Guam.

## FACTUAL ALLEGATIONS

10. KINGTO incorporates the above paragraphs as if fully set forth herein.

11. KINGTO incorporates all allegations contained in her Charge of Discrimination in EEOC Charge No. 486-2017-00406 filed on August 28, 2017 and her Response Statement dated August 16, 2018 (True and correct copies of each of the foregoing can be found attached as Exhibit "B" and Exhibit "C").[1]

12. IT&E is a telecommunications and internet provider that services both Guam and the CNMI.

13. Shirley Dotts is IT&E's Human Resources Director in Saipan.

14. Theresa Taimanglo is IT&E's Regional Human Resource Director for both the CNMI and Guam.

15. Hans Mickelson is IT&E's CNMI Branch Sales Manager.

---

[1] A copy of IT&E's Position Statement dated July 16, 2018 can be found attached as Exhibit "D".

VERIFIED COMPLAINT FOR VIOLATIONS OF AMERICANS WITH DISABILITIES ACT, THE AGE DISCRIMINATION IN EMPLOYMENT ACT, AND WRONGFUL TERMINATION
PAGE 3

16. Cris Baluyut is IT&E's Sales Manager in Guam.

17. John Matanona is IT&E's former Sales Department Manager for Saipan and Guam whose employment with IT&E ended around the latter part of 2011.

18. KINGTO began working for IT&E in 1989 at its Saipan office.

19. KINGTO worked in IT&E's Saipan office from 1989 up to February 2010, when IT&E transferred her to its Guam office for a supposedly temporary work assignment.

20. During her career with IT&E, KINGTO had several job titles while working for IT&E including Service Order Specialist, Plant Service Center Specialist, and Universal Service Representative ("USR").

21. At one point in her career with IT&E as a Plant Service Center Specialist, KINGTO was the only person in IT&E who handled monthly temporary disconnection, reconnection, and permanent disconnection of services for the islands of Rota, Tinian, and Saipan.

22. To perform disconnections and reconnections, KINGTO typed between 500 to1000 phone numbers into IT&E's switchboard along with instructions throughout the night, and then would return to work her normal shift from 8am to 5pm throughout the day.

23. In 2007, KINGTO was diagnosed with carpal tunnel syndrome.

24. In January 2009, KINGTO applied for a USR position in IT&E's Business Sales Department in Saipan, which was under the supervision of John Matanona, who was IT&E's Sales Department Manager for Saipan and Guam.

25. John Matanona is a former employee of IT&E as his employment with IT&E was terminated in sometime in the latter end of 2011.

26. KINGTO was well-versed in utilizing IT&E's data-systems called Net Suite and AS400, which were used to generate monthly reports and commissions.

27. Towards the end of 2009, in his capacity as KINGTO's supervisor in Saipan, John Matanona proposed ("2009 Proposal") to KINGTO that she transfer to IT&E's Guam office so that she could help him train employees there on how to use the data-entry systems KINGTO was well-versed in.

28. KINGTO refused John Matanona's 2009 Proposal.

29. Around February 2010, John Matanona again proposed to KINGTO that she transfer to Guam to help him at IT&E's Guam office ("2010 Proposal") to train Guam employees to use Net Suite and AS400.

30. KINGTO was hesitant to accept John Matanona's 2010 Proposal as she was afraid that she would lose her employment status and benefits that she had accrued while working in IT&E's Saipan office.

31. To entice KINGTO to transfer to IT&E's Guam office in 2010, John Matanona, in his official capacity as IT&E's sales department manager and KINGTO's supervisor, assured KINGTO that IT&E would transfer her back to Saipan after approximately six (6) months; that KINGTO would retain all of her Saipan-specific employment benefits, Saipan-specific job title, and Saipan-union status while on Guam; and that her transfer to the Guam office would not affect her employment benefits and status in any way. In sum, John Matanona, in his official capacity at the time, assured KINGTO that the only thing that would temporarily change with respect to her employment was KINGTO's geographic location.

VERIFIED COMPLAINT FOR VIOLATIONS OF AMERICANS WITH DISABILITIES ACT, THE AGE DISCRIMINATION IN EMPLOYMENT ACT, AND WRONGFUL TERMINATION
PAGE 5

32. KINGTO ultimately accepted John Matanona's 2010 Proposal after he had given her his assurances that her employment status and benefits would not be affected by the supposedly temporary transfer.

33. After KINGTO accepted John Matanona's 2010 Proposal, John Matanona then communicated to IT&E staff and the other above-named Defendants that he would like KINGTO transfer to Guam to be expedited based on the fact that she would like to immediately join her husband and family in Guam.

34. John Matanona communicated to IT&E and the other above-named defendants that KINGTO's husband accepted a job offer in Guam and had already moved there.

35. At the time John Matanona made his representations to IT&E staff and the other above-named defendants about KINGTO's husband's supposed move to Guam, KINGTO's husband never applied to a position in Guam, moved to Guam, nor even considered moving to Guam.

36. John Matanona's communication to IT&E management and the other above-named defendants regarding KINGTO's husband and her supposedly strong desire to transfer to Guam were false.

37. At no time did KINGTO ever represent to John Matanona that she would like her supposedly temporary transfer to Guam expedited, nor did she ever represent that her husband had any intention of moving to Guam or that he had ever moved there prior to her transfer.

38. Around February 2010, KINGTO moved to Guam solely to begin her supposedly temporary work transfer and assignment at IT&E's Guam office.

39. On February 5, 2010, Shirley Dotts, IT&E's human resources director for Saipan and Guam, called KINGTO to instruct her to contact an IT&E human resources staff member named Thelma Sian to inform her that KINGTO was transferring to Guam.

40. Initially, Thelma Sian refused to process KINGTO's employment and administrative papers for her to begin work at the Guam branch as IT&E's management in Saipan did not inform her of KINGTO's transfer to Guam themselves.

41. KINGTO then Shirley Dotts and explained that Thelma Sian refused to process her employment papers in Guam ("February Phone Call").

42. In KINGTO's February Phone Call with Shirley Dotts, KINGTO explained that she was instructed by John Matanona to report to the Guam office; that she was under the impression that she was being temporarily transferred from IT&E's Saipan office to its Guam office; that the Guam branch officials were not accepting her; and that she would like to begin work so that she may earn much-needed income.

43. Shirley Dotts explained to KINGTO that she would take care of the issues regarding her transfer to IT&E's Guam office and instructed KINGTO to remain on Guam until the issues were resolved

44. On information and belief, after receiving instructions from Shirley Dotts, Thelma Sian then began processing KINGTO's employment and administrative papers for her to begin work at the Guam office.

45. As soon as Thelma Sian processed KINGTO's paperwork, KINGTO began working at the Guam office around February 2010 per John Matanona's instructions as her direct supervisor under IT&E.

46. Upon her arrival to officially start work at IT&E's Guam office, KINGTO was assigned an office land-line with Saipan phone number 670-682-2882.

47. While KINGTO was just starting her assignment on Guam, Shirley Dotts contacted KINGTO and informed that her salary would be set at the Saipan-union rate according to the scale in the "union book" and explicitly instructed KINGTO not to discuss her salary with anybody else.

48. While being processed for employment at the Guam office, KINGTO was always under the impression, as John Matanona and Shirley Dotts represented to her as her superiors under IT&E, that her employment in Guam was temporary.

49. While executing her employment documents to begin her employ in IT&E's Guam office, KINGTO entered a local Guam address, which belonged to a family member, solely because IT&E's human resources department informed her that a local Guam address was required on her documents for her to begin. IT&E's human resources department officials also informed KINGTO that they required her to execute the documents they presented to her in order for her to begin working in IT&E's Guam branch.

50. While on Guam in 2010, KINGTO performed the exact same tasks she was performing in Saipan under her responsibilities as a USR, such as data-entry tasks concerning Saipan-specific data and revenue.

51. Around August 2010, approximately six (6) months after she arrived on Guam, KINGTO asked John Matanona when she would be able to return to work in Saipan, and John Matanona responded that he still needed her help for a few more months.

VERIFIED COMPLAINT FOR VIOLATIONS OF AMERICANS WITH DISABILITIES ACT, THE AGE
DISCRIMINATION IN EMPLOYMENT ACT, AND WRONGFUL TERMINATION
PAGE 8

52. As the months passed during her supposedly temporary employ in IT&E's Guam office, KINGTO remained vocal about her desire to return IT&E's Saipan office.

53. As a result of continuous data-entry tasks at IT&E's Guam office, KINGTO's existing bilateral carpal tunnel disability worsened, and she required surgery on her hands.

54. KINGTO had two (2) surgeries in 2011, two (2) surgeries in 2012, and one (1) surgery in 2013 for her bilateral carpal tunnel syndrome, all while she was assigned to IT&E's Guam branch.

55. After undergoing surgery in February 2011, KINGTO took FMLA leave from work to recover from her surgery and undergo therapy for a few months.

56. After her leave, KINGTO returned to work at IT&E's Guam office in September 2011.

57. When KINGTO returned to work in IT&E's Guam office in September 2011, she discovered that John Matanona was no longer working for IT&E.

58. Immediately after learning that John Matanona was no longer working for the IT&E and worried about her employment status with IT&E's CNMI branch, KINGTO immediately contacted Shirley Dotts and Theresa Taimanglo to ask when she would be transferred back to IT&E's Saipan office.

59. Shirley Dotts's response to KINGTO was that she cannot return to Saipan because the USR positions in Saipan were unionized, and KINGTO's supposedly former position in Saipan as a "USR" was a union-position that could only be filled by union employees.

60. At the time Shirley Dotts informed KINGTO that the USR positions in Saipan were unionized, KINGTO's job code and duties were identical to that of USR positions in Saipan.

61. Before KINGTO was transferred to Guam, IT&E led KINGTO to believe that her union status would remain unchanged by her supposedly temporary move to Guam by assigning her identical duties, credentials, and job codes specific to Saipan while she was on Guam.

62. John Matanona, in his former official capacity as one of IT&E's managers, led KINGTO to believe that she would not lose her union status since she was only going to work in Guam temporarily.

63. Shirley Dotts, in her official capacity as IT&E's human resources director in Saipan, led KINGTO to believe that she would not lose her union status by granting her a salary based on the "union book" and instructing her not to disclose it to anyone.

64. KINGTO relied on both John Matanona and Shirley Dotts' representations that she would not lose her union status while on Guam.

65. While she was working on Guam and after the defendants in Guam refused to transfer Kingto back to Saipan because the position KINGTO had supposedly left was unionized, KINGTO discovered that IT&E and the defendants located in Guam unilaterally ended her union due payments to the Saipan union.

66. KINGTO never authorized IT&E or any of its staff to end her union due payments or union membership, nor did she waive her status as a union employee.

67. As a result of IT&E unilaterally ending KINGTO's union payments, KINGTO lost her status as a Saipan union-member employee, which supposedly rendered her ineligible to be transferred back to her position in Saipan according to Shirley Dotts and Theresa Taimanglo.

68. KINGTO later discovered a "Proposed Effective Date Personnel Action Request" that purported to transfer KINGTO's job title from "USR" to "Sales Support Staff" which was dated February 22, 2010.

69. A "Sales Support Staff" position was specific to IT&E's Guam branch office.

70. KINGTO never applied to a "Sales Support Staff" position nor did she have any knowledge of the purported transfer and revocation of her union payments until she requested her personnel file from IT&E's human resources department in September 2011, after IT&E's Guam based managers, i.e., the Guam-based defendants, refused to transfer her back to Saipan.

71. As a result of unilaterally altering KINGTO's job title to "Sales Support Staff," the Guam- based Defendants informed KINGTO that she would have to re-apply to USR positions, which were unionized, in Saipan if she would like to return to Saipan.

72. The Guam-based defendants knew, or should have known, that by unilaterally stripping KINGTO of her USR position and union status, they were also stripping her of her ability to transition back to IT&E's Saipan branch.

73. The same day IT&E's officials told KINGTO she could not return to Saipan, KINGTO also discovered that IT&E had stripped her of more than three-hundred-fifty (350) hours of leave of which she had accumulated throughout her more than twenty-years of service to IT&E.

74. As a result of IT&E wrongfully stripping her of her leave, KINGTO was forced to retain legal representation to recover the leave that IT&E had wrongfully stripped from her.

75. Ultimately, Defendant admitted that it was a simple error on its part and returned KINGTO's leave back to her, but only after she had incurred significant damages in attorney's fees in the amount of approximately $15,000.00.

76. In 2016, IT&E and the Guam-based defendants as well as Hans Mickelson in the CNMI, sent KINGTO back to Saipan for about three (3) weeks on a temporary work assignment to train younger employees under the age of forty-years old to use IT&E's data entry systems.

77. Before KINGTO was sent to Saipan to conduct the training around July 2016, Hans Mickelson, in his official capacity, conspired with other management officials to create certain conditions for KINGTO's work assignment so that KINGTO would not get any notion that she would be returning to work in IT&E's Saipan branch permanently. For instance, in an email to Cris Baluyut, Julian Coopernurse, and other IT&E staff in Saipan, Hans Mickelson emphasized that IT&E cover all expenses during KINGTO's trip to Saipan to train employees so that KINGTO would not expect or assume that her work-trip to Saipan meant she was being transferred back to IT&E's Saipan office on a full-time basis.

78. All while working in Guam, KINGTO's log-in credentials, administrative work-phone, and data-entry duties were all specific to Saipan-related programs and tasks.

79. All while working in Guam, KINGTO performed tasks that were directly related to the Saipan branch and which were also being performed by staff in the Saipan branch.

80. All while working in Guam, the named-defendants executed a concerted, discriminatory, effort to force KINGTO out of her employ with IT&E by forcing her to work in the Guam office against

her will after falsely assuring her that her transfer to Guam was supposedly temporary and would last just a few months.

81. On March 1, 2017, despite KINGTO's constant and explicit complaints about her transfer to IT&E's Guam office and her desire to return to IT&E's Saipan office, the Guam-based defendants still working for IT&E called a meeting with KINGTO in order to discuss her future employment with IT&E's Guam branch and to express that no employment opportunity was available for her in Saipan unless she re-applied to those positions.

82. Based on her past interactions with Defendants, KINGTO is reasonably certain that if she were to re-apply to a Saipan position as instructed that she would not be granted employment and/or lose all of her benefits of which she had accrued over her more than 25 years of service to IT&E.

83. From September 2011 to March 2017, due to IT&E's refusal to allow KINGTO to return to work in the CNMI branch, KINGTO incurred rental and home leasing expenses each and every month within such period as she was forced to work on Guam for IT&E's Guam branch. At the same time, KINGTO also suffered from emotional stress and mental anguish in that she felt harassed and discriminated against by the Defendants on the basis of her age and disability.

**COUNT I: Violation of the Americans with Disabilities Act (ADA), 42 USC § 12101, _et seq._**

84. KINGTO incorporates the above paragraphs as if fully set forth herein.

85. IT&E is a covered entity as defined by 42 U.S.C. § 12181(7)(E) and 7(F).

86. KINGTO is an individual with a disability as defined by 42 U.S.C. § 12102(1)(A) and (B).

87. Title 42 U.S.C. § 12112(a) states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

88. Defendants violated 42 U.S.C. § 12112(a) by their discriminatory actions against KINGTO on the basis of her disability as alleged herein and throughout this complaint.

89. Defendants violated 42 U.S.C. § 12112(a) by discriminating against KINGTO by unilaterally and willfully rendering her ineligible to return to her original position in IT&E's Saipan office.

90. Around March 2011, while KINGTO was working at the Guam office as a full-time employee, KINGTO required surgery on both of her hands.

91. After her surgery, KINGTO required approximately six (6) months of time to recover.

92. Around September 2011, KINGTO returned to work at IT&E's Guam branch office.

93. Upon KINGTO's return to work in September 2011, John Matanona was no longer an employee for IT&E, and KINGTO was instructed to report to Cris Baluyut, IT&E's Sales Manager in Guam.

94. Prior to her surgery in 2011, KINGTO had been working for IT&E since 1989 and was well-versed in IT&E's administrative practices and data-entry systems.

95. KINGTO's work performance was consistently determined to be "satisfactory" and she had no history of disciplinary action while working for IT&E.

96. When KINGTO returned to work in September 2011 after her surgery, Cris Baluyut, in his official capacity, assigned KINGTO to perform filing and organizational tasks manually, which required extensive use of both of her hands.

97. After returning to work from her surgery, from September 2011 to January 2012, IT&E did not provide any reasonable accommodations to KINGTO despite her constant complaints about pain

in her hands and despite Defendants knowledge that KINGTO had just returned from carpal tunnel surgery.

98. In January 2012, KINGTO submitted a "Medical Work Excuse and Restrictions" Note ("Note") from her doctor to Cris Baluyut. This Note stated that KINGTO should not perform any pushing, pulling, or lifting of weight more than 10 pounds with either of her hands; should not climb; and she should work a reduced schedule from 9am to 3pm from Monday to Friday. Also, this Note authorized KINGTO to perform data entry tasks.

99. Upon receipt of the note, IT&E and the Guam-based defendants reduced KINGTO's work schedule according to the doctor's orders, but at the same time, restricted KINGTO from accruing any leave while she worked on a reduced work schedule.

100.      Despite her doctor's restrictions, IT&E and defendants in Guam increased KINGTO's responsibilities and IT&E officials, such as Cris Baluyut, instructed her to perform more data entry tasks than before despite her doctor's restrictions.

101.      Despite her doctor's restrictions, KINGTO was assigned several more responsibilities such as aiding with collections, corporate liaison/greeter, corporate call monitor, corporate documents filer, corporate collections, and Saipan sales activity track – modifier/data engineer.

102.      Due to the increased responsibilities and duties assigned to KINGTO by IT&E through its Guam-based defendants despite her carpal tunnel condition, KINGTO's disability worsened to the point where she required additional surgery.

VERIFIED COMPLAINT FOR VIOLATIONS OF AMERICANS WITH DISABILITIES ACT, THE AGE
DISCRIMINATION IN EMPLOYMENT ACT, AND WRONGFUL TERMINATION
PAGE 15

103.    Defendants discriminated against KINGTO because of her disability by limiting, segregating, and classifying her in a way that adversely affected her opportunities and employee status because of her disability in violation of 42 U.S.C. § 12112(b)(1).

104.    Defendants discriminated against KINGTO because of her disability by participating in a contractual or other arrangement or relationship that had the effect of subjecting her, as IT&E's employee with a disability, to discrimination prohibited by the ADA in violation of 42 U.S.C. § 12112(b)(2).

105.    Defendants discriminated against KINGTO because of her disabilities, by utilizing standards, criteria, and methods of administration that had the effect of discrimination on the basis of her disability in violation of 42 U.S.C. § 12112(b)(3)(A)-(B).

106.    Defendants discriminated against KINGTO because of her disability in violation of 42 U.S.C. § 12112(5)(A) by not making reasonable accommodations for her known physical limitations as a qualified individual with a disability who was IT&E's employee.

107.    Defendants discriminated against KINGTO because of her disability by "denying employment opportunities to a [her] [as a] qualified individual with a disability . . . because. . . denial is based on the need of such covered entity to make reasonable accommodation to the physical . . . impairments of the employee" in violation of 42 U.S.C. § 12112(5)(B).

108.    Defendants' conduct is a violation of Title VII of the ADA and on account thereof, KINGTO is entitled to recover the expenses of the litigation, including, but not limited to, reasonable attorney's fees and costs for which Defendants are liable to KINGTO under 42 U.S.C. § 12205.

**COUNT II: Violation of Age Discrimination**

**in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.***

109.      KINGTO incorporates the above paragraphs as if fully set forth herein.

110. IT&E is an "employer" as defined by 29 U.S.C. § 630.

111. KINGTO is above 40 years old is therefore covered by 29 U.S.C. § 621, *et seq.*. 29 U.S.C. § 631(a).

112. IT&E engages in an industry affecting commerce which has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year as defined by 29 U.S.C. § 630.

113. From September 2011 through March 2017, KINGTO's performance on employment evaluations indicated that KINGTO exhibited consistently satisfactory or good performance reviews.

114. From September 2011 through March 2017, while KINGTO was assigned to work in Guam, Defendants engaged in a pattern and practice of discriminating against her as a person over the age of 40 by: (a) knowingly and intentionally, in IT&E's hiring and employment practices, treating her adversely, and treating preferentially individuals who were under 40 years old, and (b) filling a disproportionally large percentage of its workforce with individuals under 40 years old when KINGTO was readily available and well-qualified for the position.

115. As a direct and proximate result of Defendants' intentional discrimination, KINGTO was denied employment in IT&E's Saipan branch, and denied the fair opportunities with regard to positions, compensation, and/or employment with IT&E in its Saipan office.

116. From September 2011 through March 2017, IT&E and the other defendants used policies and practices related to hiring and employment described herein, that had a disparage impact on the basis of age (discriminating against workers who are age 40 and older) that was not job-related for the position of which KINGTO applied, not consistent with business necessity and were not necessitated by any reasonable factor other than age.

117. Around March 2017, KINGTO was unlawfully discharged by Defendant and was unable to secure employment for IT&E in Saipan due to the supposed unavailability of positions which are filled by persons under the age of 40 years old.

118. Defendants discriminated against KINGTO by discriminating against her with respect to her compensation, terms, conditions, and privileges of employment based on her age, in violation of 29 U.S.C. § 623(a)(1) and (a)(2).

119. Defendants discriminated against KINGTO by limiting, segregating, and classifying her in a way that deprived, or tended to deprive, her of employment opportunities and which adversely affected her status an employee because of KINGTO's age, in violation of 29 U.S.C. § 623(a)(1) and (a)(2).

120. The subjection of KINGTO to disparate treatment and adverse employment practices by Defendants in whole or substantial part because of her age was in violation of the ADEA, 29 U.S.C. § 623(a)(1) and (a)(2).

121. Defendants' violation of the ADEA was willful and KINGTO seeks liquidated damages for each violation.

122. Defendants' violation of the ADEA was willful because their stated justifications for refusing to allow KINGTO to return to her original position in IT&E's CNMI branch was a deception calculated to cover up the fact that it knew its actions violated the ADEA.

123. KINGTO has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of Defendants' violation of her civil rights as alleged herein. KINGTO is reasonably certain to continue to suffer these damages in the future. KINGTO is entitled to the rights and remedies at law provided by the ADEA, 29 U.S.C. § 216(b).

## COUNT III: WRONGFUL TERMINATION

## BASED ON UNLAWFUL RETALIATION AGAINST KINGTO

124. KINGTO incorporates all of the above paragraphs as if fully set forth herein.

125. Defendants committed unlawful employment practices when they retaliated against KINGTO for her efforts to oppose practices reasonably believed to be prohibited by the ADA, 42 USC § 12101, *et seq.*, and the ADEA, 29 U.S.C. § 621, *et seq.*.

126. KINGTO has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of defendants' violation of her civil rights as alleged herein. KINGTO is reasonably certain to continue to suffer these damages in the future. KINGTO is entitled to the rights and remedies at law provided by the ADA, the ADEA, and 42 U.S.C. 1981a, including actual damages, compensatory damages, punitive damages, and attorney's fees.

**PRAYER FOR RELIEF**

WHEREFORE, KINGTO prays that this Court will:

1.  Grant judgment in favor of KINGTO on her Complaint and declare that Defendants violated the American with Disabilities Act (ADA) under 42 U.S.C. § 12101, et seq. and the Age Discrimination in Employment Act (ADEA) under 29 U.S.C. § 621, et seq., as well as find the Defendants to have wrongfully terminated KINGTO by unlawfully retaliating against her for opposing practices reasonably believed to be in violation of the ADA and ADEA.

2.  Grant KINGTO compensatory and punitive damages in the amount of $200,000.00 for Defendants' violation of the American with Disabilities Act (ADA).

3.  Grant KINGTO liquidated damages in an amount to be determined at trial for Defendants' violation of the Age Discrimination in Employment Act (ADEA).

4.  Grant KINGTO attorney's fees and costs in an amount to be determined at trial for Defendants' violation of the Age Discrimination in Employment Act (ADEA).

5.  Grant all other forms of relief that this Court deems just and reasonable.

**DEMAND FOR A JURY**

KINGTO demands a jury trial on all issues and claims triable by a jury.

Dated this __21__ of November, 2018.

/s/ _____

JOSE S.P. MAFNAS JR.
Attorney-At-Law

1

2

## **VERIFICATION**

3

I, TERRY KINGTO, declare under penalty of perjury that I have read the foregoing verified

4

complaint and that it is true and correct to the best of my recollection and knowledge and this declaration

5

6

was executed on this _21_ day of November 2018, at Saipan, Commonwealth of the Northern Mariana

7

Islands.

8

9

10

_Terry Kingto_

TERRY KINGTO

11

Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VERIFIED COMPLAINT FOR VIOLATIONS OF AMERICANS WITH DISABILITIES ACT, THE AGE
DISCRIMINATION IN EMPLOYMENT ACT, AND WRONGFUL TERMINATION
PAGE 21